[Cite as *Cotterill v. Turner*, 2009-Ohio-5657.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

MATTHEW R. COTTERILL,                           CASE NO. 5-09-22

   PLAINTIFF-APPELLEE,

 v.

AMANDA J. TURNER,                                 O P I N I O N

   DEFENDANT-APPELLANT.

**Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20740186**

**Judgment Affirmed**

**Date of Decision:  October 26, 2009**

**APPEARANCES:**

   *Charles R. Hall* **for Appellant**

   *Thomas D. Drake* **for Appellee**

**PRESTON, P.J.**

{¶1} Mother-appellant, Amanda J. Turner ("Turner"), appeals the Hancock County Court of Common Pleas' judgment adopting the magistrate's decision designating father-appellee, Matthew R. Cotterill ("Cotterill"), as the residential parent and legal custodian of the parties' minor child, Aubrea Rose Cotterill ("Aubrea") (D.O.B. 10/31/06). For the reasons that follow, we affirm.

{¶2} Turner and Cotterill are the natural parents of Aubrea, a minor child born in Hancock County, Ohio on October 31, 2006. (Doc. No. 1, Ex. A); (June 12, 2008 Tr. at 39). Turner and Cotterill were never married, but Cotterill contributed to Aubrea's care and support. (Doc. No. 1, at ¶¶4-5); (Apr. 17, 2008 Tr. at 174, 206-09). Around June of 2007, Turner contacted the Hancock County Child Support Enforcement Agency ("HCCSEA") to commence a parentage action and establish a child support order. (Doc. No. 1, at ¶7); (Plaintiff's Ex. 26). HCCSEA set the matter for an administrative hearing to be held on July 23, 2007, but Turner failed to appear at the hearing. (Doc. No. 1, at ¶¶7-8, Ex. B); (Plaintiff's Ex. 26). Cotterill subsequently found out that Turner had moved to Arizona with Aubrea just a few days prior to the hearing. (Doc. No. 1, at ¶8); (Apr. 17, 2008 Tr. at 183-84).

{¶3} On August 1, 2007, Cotterill filed a complaint to establish parentage and to be designated as Aubrea's residential parent and legal custodian in the

Hancock County Court of Common Pleas, Juvenile Division. (Doc. No. 1). The trial court set the matter for a hearing to be held on August 20, 2007. (Doc. No. 2). On August 16, 2007, Attorney Charles R. Hall, Jr. entered a limited appearance on Turner's behalf for the purpose of contesting the trial court's jurisdiction and requesting that all court documents be served on him at his office in Tiffin, Ohio. (Doc. No. 3). That same day, Attorney Hall filed a motion for a continuance of the hearing, which the trial court granted and rescheduled the hearing for October 16, 2007. (Doc. Nos. 4, 6, 7). The hearing was later continued to October 29, 2007. (Doc. Nos. 11, 12, 13).

{¶4} At the October 29, 2007 hearing, Cotterill made an oral motion for genetic testing, which the magistrate granted. (Doc. No. 14). On January 4, 2008, HCCSEA filed a report of genetic testing, which indicated Cotterill's probability of paternity for Aubrea at 99.99%. (Doc. No. 16).

{¶5} On April 17, 2008, an adjudication hearing was held before the magistrate, but the parties herein were unable to finish the hearing, so a further hearing was held on June 12, 2008. (Doc. Nos. 17, 18, 22-23). On April 18, 2008, the trial court filed a judgment entry ordering, decreeing, and adjudging Cotterill as "the biological father of Aubrea Rose Cotterill, and that a parent-child relationship exists between them." (Doc. No. 20).

{¶6} On June 12, 2008, the trial court held its further adjudicative hearing, and on October 31, 2008, the magistrate issued a decision designating

Cotterill the residential and custodial parent of Aubrea. (Doc. No. 26). The magistrate also ordered that Turner: be entitled to parenting time in accordance with the local rules with some modifications; and pay $150.00 per month, plus an additional $30.00 per month toward any arrearage, in child support. (Id.). The magistrate further found that it was in Aubrea's best interest that Cotterill be granted the child tax credit for Aubrea (Id.).

{¶7} On January 6, 2009, Turner filed objections to the magistrate's decision. (Doc. No. 46).[1] On June 9, 2009, the trial court overruled Turner's objections and approved and adopted the magistrate's decision. (Doc. No. 51). On June 25, 2009, Turner filed a notice of appeal. (Doc. No. 54).

{¶8} Turner now appeals raising one assignment of error for our review.

**ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN UPHOLDING THE MAGISTRATE'S DECISION AWARDING CUSTODY TO THE APPELLEE.**

{¶9} In her sole assignment of error, Turner argues that the trial court erred in adopting the magistrate's decision awarding Cotterill custody of Aubrea. Specifically, Turner argues that the trial court's decision was in error because: the magistrate erred in finding that there was no testimony concerning the child's

---

[1] Initially, Turner filed objections on Nov. 6, 2009, within Civ.R. 53(D)(3)(b)(i)'s 14-day filing requirement; however, those objections were overruled by the trial court because Turner failure to provide a transcript as required by Juv.R. 40(E)(3)(b). (Doc. Nos. 33, 40). However, the trial court subsequently vacated this judgment after it was notified by counsel that the court reporter was requesting an extension of time (until Dec. 30, 2008) to file transcripts. (Doc. No. 42).

relationship with Turner's family in Arizona; the magistrate erred by finding a lack of evidence of the child's life in Arizona; the magistrate incorrectly determined that Cotterill would better facilitate court-ordered visitation when he denied visitation to Turner's mother; the magistrate incorrectly found that Turner failed to notify Cotterill that she was moving with Aubrea to Arizona; Cotterill made no child support payments; and the magistrate failed to consider that she was Aubrea's primary caregiver.

{¶10} Cotterill, on the other hand, argues that the trial court did not abuse its discretion by designating him as Aubrea's residential and custodial parent. Contrary to Turner's arguments, Cotterill points out that he was never ordered to pay child support, and the record demonstrates that he did financially support Aubrea. Cotterill also argues that the trial court did consider evidence concerning Aubrea's primary caregiver, though the evidence of Turner being so was scant. Furthermore, Cotterill argues that the evidence concerning *Aubrea's* relationship to Turner's step-family in Arizona was *de minimis*. Finally, Cotterill argues that Turner has waived any issues related to child support, visitation, and the child tax credit since she failed to object to the magistrate's decision on these grounds.

{¶11} "[I]n any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child," the court must review pertinent testimony and evidence and "allocate the parental rights and responsibilities for the care of the minor children[.]" *Pennycuff v. Thompson*, 3d Dist. No. 13-05-48,

2006-Ohio-1410, ¶6, quoting R.C. 3109.04(A). R.C. 3109.04(B)(1) provides, in pertinent part, that "[w]hen making the allocation of the parental rights and responsibilities for the care of the children * * * the court shall take into account that which would be in the best interest of the children." R.C. 3109.04(F)(1), in turn, provides:

**In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to:**

**(a) The wishes of the child's parents regarding the child's care;**

**(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**

**(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d) The child's adjustment to the child's home, school, and community;**

**(e) The mental and physical health of all persons involved in the situation;**

**(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)      Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;**

**(i)      Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j)      Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

"[W]hen weighing the factors necessary to determine the best interest of the child, 'it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses.'" *McDonald v. Johnston* (Nov. 22, 1995), 3d Dist. No. 1-95-37, at *1, quoting *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178.  Additionally, "[w]ith regard to these factors, this court has previously

- 7 -

found that '[n]o single factor is determinative of the best interest of a child, rather the determination should be made in light of the totality of the circumstances.'" *Johnston*, 3d Dist. No. 1-95-37, at *2, quoting *Shipp v. Shipp* (Jan. 27, 1987), 3d. Dist. No. 14-85-26.

**{¶12}** As an appellate court, we review the trial court's judgment allocating parental rights and responsibilities under an abuse of discretion standard. *Fricke v. Fricke*, 3d Dist. No. 1-06-18, 2006-Ohio-4845, ¶6, citing *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846 and *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159. An abuse of discretion is more than an error in law; rather it connotes that the trial court's judgment is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Under the abuse of discretion standard, "an appellate court may not merely substitute its judgment for that of the trial court." *Inbody v. Swartz*, 3d Dist. No. 5-06-37, 2007-Ohio-1086, ¶17, citations omitted.

**{¶13}** The magistrate, in rendering her decision, made findings of fact relative to each of the applicable R.C. 3109.04(F)(1) "best interest" factors. (Oct. 31, 2008 Decision, Doc. No. 26). After an independent review of the magistrate's findings, the trial court approved and adopted the magistrate's decision. (June 8, 2009 JE, Doc. No. 51). We will review the magistrate's R.C. 3109.04(F)(1) findings disputed by Turner.

{¶14} With respect to R.C. 3109.04(F)(1)(c)—the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest—the magistrate found:

> **[t]here was much testimony about interaction and interrelationships between Aubrea and persons in Hancock County, including both grandmothers, but no testimony about her interaction with the Defendant's family in Arizona. When she was living in Hancock County, and when she returned for extended parenting time, all the testimony indicated that she was well adjusted and happy.**

(Oct. 31, 2008 Decision, Doc. No. 26). With regard to R.C. 3109.04(F)(1)(d)—the child's adjustment to the child's home, school, and community—the magistrate found Aubrea's adjustment to school and community inapplicable due to her young age. (Id.). With regard to Aubrea's adjustment to the community, the magistrate found that there was much testimony about Aubrea's adjustment to Cotterill's home and family but little about her adjustment to Turner's. (Id.).

{¶15} Turner argues that the magistrate erred in finding that there was no testimony about her family in Arizona and the child's adjustment to Arizona. Turner also argues that the trial court "did not address that [she] was the child's primary caregiver." (Appellant's Brief at 6). Although the record contains some evidence concerning *Turner's* relationship with the individuals in Arizona, the record contains *de minmis* evidence of any "interaction and interrelationship" between Aubrea and the individuals in Arizona—the relevant consideration under R.C. 3109.04(F)(1)(c). Furthermore, the record contains scant evidence of

Aubrea's adjustment to Arizona in general. Additionally, contrary to Turner's assertion, the magistrate did consider Turner's testimony that she was Aubrea's primary caregiver.

{¶16} Turner testified that, when she moved to Arizona in July 2007, she moved in with her "half brother," Jason Leeper, and "sister-in-law," Carlena Leeper, but Turner admitted that Jason was not the son of her mother or father. (Apr. 17, 2008 at 37-38). Turner reasoned, however, that she "grew up thinking [Jason] was [her] brother. Therefore, he is [her] brother." (Id. at 37). Likewise, Turner testified that her father was Scott Leeper, though "it's not proven on paper by adoption, but it can be. And it's not determined, because I don't want to waste the money and the time on that." (Id. at 38). Turner, however, testified that she has always been close with Scott Leeper and considers him her "ex-stepfather." (June 12, 2008 Tr. at 45).

{¶17} Turner testified that her fiancé, Daniel Dingledine, also moved from Ohio to Arizona in October 2007 to live with her in Jason and Carlena Leeper's home. (Id. at 41-44). Turner testified that Dingledine watched Aubrea from October 2007 until March 2008 while she worked. (Id. at 43-44). Turner further testified that she moved from Jason and Carlena's home to her current address in February 2008. (Id. at 39); (June 12, 2008 Tr. at 38). In March 2008, Turner began taking Aubrea to Roxanne Staffler who, along with her daughter Erica, provides child care for Aubrea and four to five other children in her home. (Apr.

17, 2008 Tr. at 42-43). Turner testified that she works from 6:00 a.m. to 3:00 p.m. three days per week and from 11:00 a.m. to 8:00 p.m. two days per week. (Id. at 39-40). Concerning whether her Arizona family watched Aubrea, Turner testified, "[m]y stepmom and sister-in-law, they can watch her. They're all family." (Id. at 44).

{¶18} Besides the limited testimony that Dingledine had provided care for Aubrea from October 2007 until March 2008 and that Turner's step-mother and sister-in-law *could* watch Aubrea, Turner testified about the relationship between Aubrea and her Arizona family as follows:

> **Q: Okay. These folks you've described as family members, almost like family members –family-like. Friends, I guess would be a better way to term it, in Arizona, have they developed a relationship with Aubrea?**
> **A: Oh, yeah.**
> **Q: Are there other kids her age and --**
> **A: Cousins and family, yes.**
> **Q: How many aunts, uncles, people are there that she considers --**
> **A: How many of them are there?**
> **Q: Yeah.**
> **A: At least ten, if not more.**
> **Q: Okay. Has she come to recognize those people as significant people, relationships in her life?**
> **A: Yes.**
> **Q: And she's 19 months old, but she does have some – she's able to form attachments --**
> **A: Oh, yeah.**
> **Q: -- to the people around her?**
> **A: Yes.**

(June 12, 2008 Tr. at 65). On cross-examination, Turner testified that her step-mother in Arizona has had contact with Aubrea but admitted that Aubrea never lived in her step-mother's home. (Id. at 91). Turner also testified that she thought it would be beneficial for Aubrea to have a relationship with her step-mother. (Id. at 92). Turner also admitted that, while she worked in Ohio during 2007, Cotterill's fiancé, mother, and father regularly provided for Aubrea's care. (Id. at 102).

{¶19} Turner also argues that the trial court did not properly consider the fact that Turner was Aubrea's primary caregiver since they moved to Arizona. We disagree. The magistrate specifically noted in her decision that "[Turner] says that Aubrea has always lived in her home, and she has been the primary caregiver." (Oct. 31, 2008 Decision, Doc. No. 26). Aside from this, the evidence presented at the hearing tended to indicate otherwise. Dingledine provided for Aubrea's care from October 2007 to February 2008 while Turner worked, and Steffler had provided child care from March 2008 until the hearing while Turner continued her full-time employment.

{¶20} Accordingly, we hold that there was credible, competent evidence upon which the magistrate could find a lack of evidence concerning the interaction and interrelationship between Aubrea and Turner's family in Arizona. At most, the record contains Turner's affirmative statements that Aubrea had relationships with these individuals, but there was no testimony concerning the extent of the

relationships. None of Turner's Arizona family testified at the hearing nor did Turner present, for example, any pictures showing Aubrea and these individuals spending time together. Additionally, the overall testimony demonstrated that Aubrea's care was primarily provided by Dingledine and Steffler, not Turner's Arizona family, while they were in Arizona. Therefore, we find Turner's argument respecting the magistrate's R.C. 3109.04(F)(1)(c) & (d) findings without merit.

{¶21} Concerning R.C. 3109.04(F)(1)(f)—the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights—the magistrate found the following:

> **Since Defendant left the State of Ohio without notifying Plaintiff and cut short a promised parenting time, Plaintiff has shown himself to be more likely to honor and facilitate parenting time rights. He has gone to Arizona to pick up Aubrea, and had promised to return her at his cost, but Defendant came to Hancock County prior to the end of the parenting time and retrieved Aubrea.**

(Oct. 31, 2008 Decision, Doc. No. 26). Turner argues that this finding is erroneous because Cotterill did not allow Turner's mother to have visitation. Turner points out that she allowed Cotterill's mother to visit Aubrea in Arizona.

{¶22} Cotterill's mother, Geri Wooddell, testified that Turner allowed her to visit Aubrea for two and one-half days in Arizona just before Christmas. (Apr. 17, 2008 Tr. at 81). On the other hand, Wooddell also testified that Turner informed her that Cotterill was not welcome to visit with Aubrea at that time. (Id.).

With regard to why he did not allow Turner's mother to see Aubrea, Cotterill

testified:

> **A: Amanda [Turner] was trying to dictate every move I made with Aubrea. You know, she'd be like, "Well, can my mom see her?" And I'd say yes and all that jazz. And her mom actually would get to see her for about four hours one day. And then I had her acquaintance or friend, Monica, texting me to see her. And I said yes, you know. Now, mind you, this is, you know, my time to spend with my child, but I gave into other people's needs. And I let her see her. I let her take her to a birthday party in North Baltimore.**
> **Q: That's Monica?**
> **A: Yes, Monica Cheney.**
> **Q: Okay.**
> **A: And then her mom again said, "I'd like to take the child up to my family," and I think that was either in Toledo or Michigan. Somewhere up north somewhere. And I said no, because I don't trust her mom at all.**
> **Q: Why didn't you trust her mother?**
> **A: Her mother's a known drug user. I know a lot of things, from being there with Amanda, that made me not trust her mother whatsoever. And I don't want a drug environment and booze and all the rest of that jazz around Aubrea. So, you know, 40, 50 miles is a little too far for my comfort, you know. And that's why I didn't let her mom take her.**
> **Q: Were there any other concerns that you had about her mother?**
> **A: The fact that she drinks regularly.**
> **Q: When you say, "drank regularly," are you saying she was just a social drinker or she drank to excess?**
> **A: No. She drank to excess.**
> **Q: And how do you know that?**
> **A: I was with her for a while.**
> **Q: What about her husband?**
> **A: He is one of the biggest drinkers I've ever seen in my entire life.**

(Id. at 189-91). In support of his assertions, Cotterill entered into evidence a certified copy of a Findlay Municipal Court sentencing entry showing that Turner's mother was convicted for possession of drug paraphernalia in May 2007. (Plaintiff's Ex. 29). Because Cotterill refused to allow Turner's mother to take Aubrea to the family reunion, Turner returned to Hancock County around the beginning of March 2008 and retrieved Aubrea, contrary to the parties' agreement that Cotterill would have visitation until April 12, 2008. (Apr. 17, 2008 Tr. at 193-94); (Plaintiff's Ex. 27). In fact, as the magistrate found, Cotterill had agreed to pay for all the expenses related to his visitation with Aubrea, including picking up and returning Aubrea to the Phoenix airport. (Plaintiff's Ex. 27).

{¶23} Additionally, Turner argues that Cotterill argued and yelled at her whenever she would talk to him about visitation. Turner also points out that she told Cotterill about her upcoming move to Arizona, but Cotterill refused to talk to her about it. We think the record demonstrates otherwise.

{¶24} Turner testified about her phone conversations with Cotterill as follows:

> **Q: Before the filing of the paperwork in this case, have you tried to work out any visitation arrangements with Matthew [Cotterill]?**
> **A: Every time Matt would call, he would yell at me about taking her away from him. And I would tell him that he could see her whenever he wanted to. All he had to do was tell me. Every time he would call and get upset with me and yell at me, I would tell him to "Calm down, Matt, I never told you you can't come see Aubrea. You can come see her whenever you want to. If you**

- 15 -

**want me to bring her back, I will bring her back for you to see her."**
**Q: Okay. Has he suggested to you what the visitation arrangements would be if he were to get custody?**
**A: No. I assume there wouldn't be any.**
**Q: And why would you assume that?**
**A: Because when she's there, I don't hardly ever get to talk to her if I call. She's busy playing with other kids or doing something along those natures. I talk to Matt. I don't get to talk to her.**

(June 12, 2008 Tr. at 68).

{¶25} Cotterill, for his part, testified that he allowed Turner to talk with Aubrea as long as Aubrea was not sleeping; otherwise, he never refused Turner's requests to speak with Aubrea. (Id. at 130). He also testified about how he found out Turner moved to Arizona with Aubrea:

**Q: Okay. Now, tell us about the -- well, did she take -- did Amanda take a trip to Arizona in June of 2007?**
**A: Yes.**
**Q: And did she tell you in advance that she was going out there?**
**A: She told me she was going out for a vacation, yes.**
**Q: All right. And did you talk to her about it once she got back?**
**A: Yes.**
**Q: And what did she tell you about that?**
**A: She said -- I said, you know, how was it? She said it was a nice place to live, you know, a nice place to live. And that's when I got the notion in my head, hey, she might take my daughter there. So that's when I decided I needed to talk to an attorney.**
**Q: And when was this?**
**A: Early July.**
**Q: All right. And did you come to see me at that point?**
**A: Yes.**
**Q: All right. Now, did she ever -- when you had this conversation with her, did she ever tell you that she, in fact, was going to move out there?**

A: Not necessarily, no.

Q: What do you mean by that?

A: She had thrown in little hints to it, but nothing like, "I'm moving out to Arizona, bye." There was no set date.

Q: Did she ever say, "I'm moving to Arizona"?

A: No.

* * *

Q: All right. So how, then, did you find out she was no longer in Ohio?

A: I kind of knew where she went. I mean, there's nowhere else she could have gone. You know, I called all her family, and finally got it out of her mom that she went to Arizona.

Q: Okay. So what did you do after that point try to contact her?

A: I called her, sent her text messages, sent her e-mails.

Q: Did she respond?

A: No.

Q: At all?

A: Nope.

Q: Never?

A: In the few days that I knew she was down there, she didn't. But after that, she started replying.

Q: All right. And when would that have been that she started replying to you?

A: July, the end of July sometime.

Q: All right. Did you actually talk to her on the phone?

A: A few times, yeah.

Q: All right. And what did she tell you?

A: "I'm staying out here and there's nothing you can do about it."

Q: Okay. Did you, after July, continue to have conversations with her over the next several months about either getting visitation with your child or her coming back?

A: I tried. I mean, YEAH, I did, but sometimes I'd get frustrated and I'd give up for a few days.

(Id. at 180-84).

{¶26} After reviewing the testimony presented, we find there was competent, credible evidence to support the magistrate's R.C. 3109.04(F)(1)(f)

finding that Cotterill would be more likely to honor and facilitate court-approved visitation. Contrary to Turner's assertions, the record demonstrates that she did not inform Cotterill of her intention of moving to Arizona. Cotterill attempted to contact Turner concerning the move, but Turner ignored his contacts until several weeks later. Furthermore, Cotterill and his mother both arranged to visit with Aubrea at their expense, and Turner ended Cotterill's visitation time early against the parties' agreement. Given the testimony, we are also not convinced that Turner's act of retrieving Aubrea was justified because Cotterill did not allow Turner's mother to take Aubrea to a family reunion some forty to fifty miles away. Cotterill *did* allow Turner's mother visitation, and Cotterill was reasonable not to allow Turner's mother to take Aubrea to a family gathering given her criminal record and her and her husband's excessive drinking. Accordingly, we find Turner's arguments lack merit.

{¶27} Next Turner argues that the magistrate erred by failing to consider under R.C. 3109.04(F)(1)(g) that Cotterill failed to provide any financial support during the pendency of the case. This argument too lacks merit. To begin with, R.C. 3109.04(F)(1)(g) concerns whether either parent has failed to make child support payments "required of that parent pursuant to a child support order under which that parent is an obligor." As the magistrate found, this factor was not applicable because no support order was in place since Turner left Ohio prior to the HCCSEA administrative hearing. (Oct. 31, 2008 Decision, Doc. No. 26).

Furthermore, like the magistrate also found, there was ample evidence in the record that Cotterill, his fiancé, and his parents had financially provided for Turner and Aubrea. Cotterill testified that his parents purchased Turner a washer and dryer, and he purchased clothes, a changing table, and provided money for other things. (Apr. 17, 2008 Tr. at 174). Cotterill identified plaintiff's exhibits 37 to 40 as photographs of clothes, toys, and toiletries he sent to Arizona for Aubrea. (Id. at 206-07); (Plaintiff's Exs. 37-40). Cotterill further testified that he had sent around $500-$600 worth of such items to Aubrea since she had been in Arizona. (Apr. 17, 2008 Tr. at 208). Between the time Aubrea was born until Turner took Aubrea to Arizona (Nov. 2007 to July 2008), Cotterill estimated that he gave Turner $1,200 to $1,300 for Aubrea's expenses. (Id. at 209). Therefore, we reject this argument as well.

{¶28} As a final matter, Turner, in a total of one paragraph, makes passing reference to the fact that she objected to the magistrate's visitation schedule, child support order, and decision to award Cotterill the child tax credit. (Appellant's Brief at 9). Although Turner did, in fact, cursorily object to these matters, Turner has not assigned error regarding these issues in her brief to this Court, nor has she even cited to the record in support of finding error. (Doc. Nos. 33, 46). In fact, this Court is not even sure whether Turner intended to argue error based upon these grounds, or whether her statement is simply to clarify the procedural history.

Under these circumstances, we decline to address these issues. App.R. 12(A)(2); 16(A)(3), (7).

**{¶29}** Having reviewed the entire record herein, we conclude that the magistrate's R.C. 3109.04(F)(1) best interest findings are supported by competent, credible evidence. Therefore, we cannot find that the trial court abused its discretion by adopting the magistrate's decision designating Cotterill as the residential and custodial parent of the parties' minor child, Aubrea.

**{¶30}** Turner's sole assignment of error is, therefore, overruled.

**{¶31}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jnc**